# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**MARC IRWIN SHARFMAN, M.D., P.A.,**

        **Plaintiff,**

**v.**                                          **Case No: 6:21-cv-525-WWB-DCI**

**INFUCARE RX LLC and INFUCARE
RX PENNSYLVANIA INC.,**

        **Defendants.**

---

## REPORT AND RECOMMENDATION

This cause comes before the Court for consideration without oral argument on the following motion:

| | |
|---|---|
| **MOTION:** | **Plaintiff's Motion to Certify Class (Doc. 50)** |
| **FILED:** | **August 5, 2022** |
| | |

**THEREON** it is **RECOMMENDED** that the motion be **DENIED**.

Marc Irwin Sharfman, M.D., P.A. (Plaintiff), individually and on behalf of others similarly situated, initiated this junk fax case against Infucare RX, LLC and Infucare RX Pennsylvania, Inc.[1] alleging violations of the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227, *et. seq.* (TCPA). Pending before the undersigned is Plaintiff's Motion for Class Certification filed

---

[1] On September 30, 2022, Defendant Infucare RX Pennsylvania, Inc. filed a Motion for Summary Judgment. Doc. 75. The parties subsequently filed a Joint Stipulation, which the Court construed as a motion to amend the Complaint. Docs. 79, 80. The Court granted the motion and deemed the Complaint amended to remove all claims against Defendant InfuCare Rx Pennsylvania, Inc. and denied the motion for summary judgment as moot. Doc. 80.

pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3).  Doc. 50 (the Motion).  Defendants[2] have filed a Response in Opposition (Doc. 55) (the Response).  With leave of Court, the parties also submitted Plaintiff's Reply to the Response (Doc. 59); Defendants' Sur-reply (Doc. 66); Plaintiff's "Rejoinder" in Support of the Motion for Class Certification (Doc. 76); and documents filed under seal (Docs. 68, 72, 78).

The Motion has been referred to the undersigned for the issuance of a report and recommendation and is ripe for review.

## I.    Background

On March 23, 2021, Plaintiff, a Florida corporation, filed a one-count Class Action Complaint alleging that Defendants violated the TCPA by sending Plaintiff an unsolicited advertisement facsimile (fax) using a telephone fax machine, computer, or other device and by faxing the same or other unsolicited fax advertisements to Plaintiff and other recipients without the required opt-out language and without first receiving the recipients' express invitation or permission.  Doc. 1 at 2, 4-5.  According to the Motion, Defendants successfully sent 11,417 unsolicited fax advertisements to 8,990 "unique fax numbers in broadcasts" on March 10, 2021; March 11, 2021; and March 18, 2021 (collectively "the March faxes").  Doc. 50 at 9.  Defendant Infucare RX, LLC (Defendant Infucare) provides in-home acute and chronic specialty infusion services.  *Id*., citing Patel Dep. at 8:17-24.  Plaintiff asserts that the faxes advertised Immunoglobulin Therapy and Infusion Therapy services and Defendant Infucare utilized third-party broadcaster Concord III, LLC d/b/a Concord Technologies (Concord) to transmit the faxes

---

[2] Defendants – plural – is use throughout this Report even though only one Defendant currently remains in this case because that is how all the briefing reads.  Nevertheless, this Report only applies to Defendant Infucare RX, LLC.

without prior express permission to a list of recipients Defendant Infucare purchased from third-party data provider Definitive Healthcare.  Doc. 50 at 9.

Plaintiff seeks an Order from the Court certifying the following class:

### Class A

All persons or entities who were successfully sent a Fax, on or about March 10, 2021, March 11, 2021, or March 18, 2021, that states: "Infucare Rx is now a Preferred Provider," and/or "Selected by Cigna's eviCore healthcare for Specialty and Non-Specialty Infusions Services," and/or "Selected by Cigna's eviCore healthcare for Specialty Pharmacy and Infusion Therapy Services."

Alternatively, Plaintiff states that if the Court seeks to distinguish between faxes successfully sent to "stand-alone" fax machines—as was the case with respect to Plaintiff—versus faxes that were successfully sent to an "online fax service," Plaintiff requests that the Court certify the following class:

### Class B

All persons or entities who were successfully sent a Fax to their stand-alone fax machine, on or about March 10, 2021, March 11, 2021, or March 18, 2021, that states: "Infucare Rx is now a Preferred Provider," and/or "Selected by Cigna's eviCore healthcare for Specialty and Non-Specialty Infusions Services," and/or "Selected by Cigna's eviCore healthcare for Specialty Pharmacy and Infusion Therapy Services."

*Id*. at 9-10.  Plaintiff adds that the proposed classes exclude "practices/physicians" with whom Defendant Infucare claims to have a relationship, which includes those who have signed declarations regarding permission.  *Id*. at 10.  Plaintiff contends that its counsel should be appointed class counsel under Rule 23(g) and Plaintiff should be appointed class representative. *Id*. "

Defendants argue that online fax service users—included within Class A—do not have claims under the TCPA and lack Article III standing.  Doc. 55.  Defendants also argue that both proposed classes fail under Rule 23(a) and Rule 23(b)(3) and certification is not justified because

Plaintiff has not demonstrated commonality, typicality, and adequacy of representation under Rule 23(a) or that common issues predominate, and a class action would be superior under Rule 23(b). *Id*. at 15-27.

## II.    The Law

### A.    The TCPA

Congress passed the TCPA in 1991 to balance "[i]individuals' privacy rights, public safety interests, and commercial freedoms of speech and trade."  Tel. Consumer Prot. Act of 1991, Pub. L. No.102-243 (1991).  It was later amended by the Junk Fax Prevention Act of 2005, Pub L. No. 109-21 (2005), codified at 47 U.S.C. § 227.  In relevant part, the TCPA prohibits the use of "any telephone facsimile machine, computer, or other devise to send, to a telephone fax machine, an unsolicited advertisement" unless:

> (i)  The unsolicited advertisement is from a sender with an established business relationship with the recipient;
>
> (ii)  The sender obtained the number of the telephone facsimile machine through-
>
> > (I)    The voluntary communication of such number, within the context of such established business relationship, from the recipient of the unsolicited advertisement, or
> >
> > (II)    A directory, advertisement, or site on the Internet to which the recipient voluntarily agreed to make available its facsimile number for public distribution,
>
> except that this clause shall not apply in the case of an unsolicited advertisement that is sent based on an established business relationship with the recipient that was in existence before the date of enactment of the Junk Fax Prevention Act of 2005 [enacted July 9, 2005] if the sender possessed the facsimile machine number of the recipient before such date of enactment; and
>
> (iii)  The unsolicited advertisement contains a notice meeting the requirements under paragraph (2)(D). . ..

47 U.S.C. § 227(b)(1)(C).

The TCPA defines the term "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise."  47 U.S.C. § 227(a)(5).  "So if a fax recipient provided 'prior express invitation or permission' to receive the fax, the fax was solicited and was not subject to the Act's prohibition on unsolicited faxes."  *Gorss Motels, Inc. v. Safemark Sys., LP*, 931 F.3d 1094, 1100 (11th Cir. 2019) (citing *BaisYaakov of Spring Valley v. Fed. Commc'ns Comm'n*, 852 F.3d 1078, 1082 (D.C. Cir. 2017)).  "Express permission to receive a faxed ad requires that the consumer understand that by providing a fax number, he or she is agreeing to receive faxed advertisements."  *Id.* (quoting *In re Rules & Regulations Implementing the Telephone Consumer Protection Act (TCPA) of 1991*, 68 Fed. Reg. 44144, 44168 (FCC July 25, 2003)).

A person or entity may bring an action to enjoin a violation of the TCPA or to recover actual damages or statutory damages of $500 for each violation, whichever is greater § 47 U.S.C. § 227(b)(3)(B).

## B.    Class Certification

The party seeking class certification must show that the proposed class meets Rule 23's requirements.  *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233–34 (11th Cir. 2016).  A plaintiff must first establish that the proposed class is "adequately defined and clearly ascertainable."  *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012)  If that is met, then Rule 23(a) requires that: (1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims or

defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect the interests of the class (adequacy).  Fed. R. Civ. P. 23(a).

In addition to Rule 23(a) requirements, the party seeking certification "must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  Here, Plaintiff seeks certification under Rule 23(b)(3), which requires that the Court find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  *See* Doc. 50 at 19*, citing Fed. R. Civ. P. 23(b)(3).

III.    **Discussion**

In this Report, the undersigned first recommends that the Court not certify Plaintiff's putative Class A because some members of that class—i.e., online fax users—do not have standing and do not have a claim under the TCPA.  Based on that finding, the undersigned then considers Plaintiff's request to certify the putative Class B (the alternative proposed class), which is composed of stand-alone fax users such as Plaintiff.  While the undersigned recommends that Class B is ascertainable and that Plaintiff has satisfied its burden with respect to the commonality and numerosity requirements under Rule 23(a), the undersigned ultimately recommends that Plaintiff's Motion be denied and that class certification is not appropriate because typicality, adequacy of representation, predominance, and superiority are lacking under Rules 23(a) and (b).

A.    **Putative Class A**

The undersigned first considers standing and the availability of a TCPA claim for the members of the putative classes.  But this analysis concerns only putative Class A because (1) it

is dispositive of the Motion as to Class A and (2) members of putative Class B have standing[3] and, as a general matter, could bring a TCPA claim.

1.       Standing

The Motion and the Response raise an issue of standing, which the undersigned will address before reaching the request for class certification under Rule 23 and the application of the TCPA.  If the Court certifies Plaintiff's Class A, the group includes standalone fax machine users as well as online fax service users.  Defendants argue against certification of Class A because the latter group of users lacks Article III standing.  Doc. 55 at 15.  The undersigned agrees.

"For a district court to certify a class action, the named plaintiffs must have standing. . .." *Vega v. T-Mobile USA*, Inc., 564 F.3d 1256, 1265 (11th Cir. 2009) (quotation omitted); *see also Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987) ("[A]ny analysis of class certification must begin with the issue of standing[.]"); *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000) ("[P]rior to the certification of a class, and technically speaking before undertaking any formal typicality or commonality review, the district court must determine that at least one named class representative has Article III standing to raise each class subclaim.").

Standing is also relevant to the requirements of Rule 23.  As the Eleventh Circuit has explained, courts must "consider under Rule 23(b)(3) before certification whether the individualized issue of standing will predominate over the common issues in the case, when it appears that a large portion of the class does not have standing . . . and making that determination

---

[3] In relation to the predominance factor, Defendants make an unsupported argument that Class B lacks standing, which argument is addressed in footnote 23 *infra*.  But Defendants make no further argument disputing Class B standing.  To the extent there is a dispute about standing as to Class B, the undersigned finds that Class B does have standing in this action as discussed in footnote 23.

for these members of the class will require individualized inquiries." *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1277 (11th Cir. 2019).

To have Article III standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id*. at 339 (quotation omitted). "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Id*. (quotation omitted). For the injury to be "concrete," it must be "real," and not "abstract"; however, it need not be "tangible." *Id*. at 352.

Relying upon recent decisions from this District, Defendants contend that Plaintiff cannot include the online fax service users because Article III standing is not present. Doc. 55 at 15. Indeed, in another junk fax TCPA case, a court found persuasive the reasoning of other decisions that the mere receipt of a fax through an online fax service, even if in violation of the TCPA, does not cause an injury in fact. *Scoma Chiropractic, P.A., et. al. v. Dental Equities, LLC, et. al.*, 2021 WL 6105590, at *4 (M.D. Fla. Dec. 23, 2021) (citing *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 929-30 (11th Cir. 2020) (noting that a statutory violation does not necessarily result in an injury in fact); *Daisy, Inc. v. Mobile Mini, Inc.*, 489 F. Supp. 3d 1287, 1295-96, 1979 (M.D. Fla. 2020) (finding that receipt of a fax via an online fax service would not occupy a fax machine or its line or impose printing costs, and "Congress did not view one wasted minute spent reviewing a junk fax received through e-mail as a concrete injury.")). The *Dental Equities* court determined that "at the very least," individualized inquiries would be required to identify the members that

received the fax via an online fax service and decide whether they have Article III standing, and those individualized inquiries would predominate over any common issue. *Id*. at *4.[4]

Plaintiff invites the Court to reject *Dental Equities* and *Daisy* and find that standing exists for the portion of Class A that received faxes through the online fax service. Doc. 50 at 27-30. Plaintiff contends in the Motion that the violation of the TCPA alone causes enough harm to establish standing. *Id*. at 29-30. Plaintiff argues that "Congress elevated the invasion of privacy, the invasion of interest in seclusion, and the nuisance that results from being sent an unsolicited fax advertisement 'to the status of legally cognizable injuries concrete, *de* facto injuries that were previously inadequate at law.'" *Id*. at 28, citing *Spokeo*, 136 S.Ct. at 1549 (2016). The Motion asserts that "[a]lthough Plaintiff alleged the Faxes violated Plaintiff's (and the proposed Classes') rights to privacy, interest in seclusion, and wasted their time. . . such 'additional harm beyond the one that Congress has identified' is not necessary to establish concrete injury." *Id*. at 28. Plaintiff also disagrees with the Consumer and Governmental Affairs Bureau's (the Bureau) statement that "the more general harms". . . "such as time spent monitoring unwanted faxes stored by online fax services—are more generalized harms that go beyond the specific harms Congress identified in enacting the TCPA." *In the Matter of Amerifactors Fin. Grp., LLC Petition for Expedited Declaratory Ruling*, 2019 WL 6712128, at *4 (C.G.A.B. Dec. 9, 2019). It is Plaintiff's position that that statement is "simply wrong" because unsolicited fax ads, including online fax service ads,

---

[4] The court in *Dental Equities* also determined that even if there may be "circumstances where an individual who received a fax via online fax service suffered an injury in fact, the Court would be required to determine on an individual basis whether each member read the fax, the time spent reviewing the fax, whether the fax was printed, or whether the member followed up on the fax," and, therefore, "the question of standing would predominate over the common issues of the class." *Id*. at *5 (citing *Cordoba*, 942 F.3d at 1277).

invade the recipient's privacy and interest in seclusion and are a nuisance.  Doc. 50 at 27 n.4.  The undersigned disagrees with Plaintiff.

The undersigned recommends that the Court find *Dental Equities*, *Daisy*, and the Bureau's statement in *Amerifactors* persuasive.  The court in *Daisy* provided that "[w]hile Congress could have extended the prohibition to faxes no matter how they are received, it did not.  So there is no indication from the statutory text that Congress sought to protect against the harm of wasted time spent reviewing faxes received by e-mail."  489 F.Supp. 3d at 1295.  The statute specifically prohibits unwanted ads sent from a fax machine, computer, or other device to a fax machine.  47 U.S.C. § 227(b)(1)(C).  Further, the court in *Daisy* determined that the plaintiff's "alleged harm for one minute of wasted time resembled no historical cause of action."  *Daisy*, 489 F.Supp. 3d at 1295.[5]

Plaintiff's argument to the contrary does not convince the undersigned that standing exists with respect to these users.  Based on the foregoing, the undersigned recommends that the Court decline the request to certify Class A.

## 2.     Application of the TCPA – Online Fax Service Users

Even if Plaintiff has established a concrete injury with respect to the online fax service users and the existence of Article III standing, the undersigned agrees with Defendants that the TCPA does not apply.  Another court in this District described the Bureau's decision on this issue as follows:

"Congress has authorized the FCC to issue regulations to implement the [TCPA]." *Scoma Chiropractic, P.A. v. Dental Equities, LLC*, No. 2:16-CV-41-

---

[5] The court in *Daisy* found that the "legislative history similarly cuts against a concrete harm.  As the Eleventh Circuit noted, 'the TCPA's prohibition against sending unsolicited fax advertisements was intended to protect citizens from the loss of the use of their fax machines during the transmission of fax data." *Id.* at 1296 (citing *Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1252 (11th Cir. 2015)).

FTM-99MRM, 2018 U.S. Dist. LEXIS 92736, 2018 WL 2455301, at *2 (M.D. Fla. June 1, 2018); *see also* 47 U.S.C. § 227(b)(2) ("The Commission shall prescribe regulations to implement the requirements of this subsection."). The FCC, in turn, has delegated "adjudication and rulemaking" functions to the Consumer and Governmental Affairs Bureau "in matters pertaining to consumers and governmental affairs." 47 C.F.R. § 0.141(a). Pursuant to that authority, in December 2019, the Bureau issued a declaratory ruling on the question of whether "an online fax service is a 'telephone facsimile machine'" under the TCPA. *In the Matter of Amerifactors Fin. Grp., LLC Petition for Expedited Declaratory Ruling*, 34 FCC Rcd 11950, 2019 WL 6712128, at *3 (C.G.A.B. Dec. 9, 2019). The Bureau concluded that "an online fax service is not a 'telephone facsimile machine' and a fax sent to one is not 'an unsolicited facsimile advertisement' prohibited by the TCPA." *Id*.

The Bureau explained that "a fax received by an online fax service as an electronic message is effectively an email." *Id*. That is because, according to the Bureau, a "consumer can delete without printing" any "faxes sent to online fax services via an attachment." *Id*. The Bureau noted that "[c]onsumers can manage those messages the same way they manage email by blocking senders or deleting incoming messages without printing them." *Id*. The Bureau also found that "an online fax service cannot itself print a fax—the user of an online fax service must connect his or her own equipment in order to do so." *Id*. Accordingly, because "online fax services differ in critical ways from the traditional faxes sent to telephone facsimile machines Congress addressed in the TCPA," the Bureau concluded that faxes received via an online fax service "are more accurately characterized as faxes sent to a 'computer' or 'other device,' and not a 'telephone facsimile machine.'" Id. at *4.

The Bureau also reasoned that "faxes sent to online fax services do not cause the specific harms to consumers Congress sought to address in the TCPA." *Id*. at *3. Those harms included that (i) "[a fax advertisement] shifts some of the costs of advertising from the sender to the recipient" and (ii) such a fax "occupies the recipient's facsimile machine so that it is unavailable for legitimate business messages while processing and printing the junk fax." *Id*. (quoting H.R. Rep. No. 317, 102d Cong., 1st Sess. 11 (1991)). The Bureau explained that "faxes sent to online fax services do not pose these harms and, in fact give consumers tools such as blocking capabilities to control these costs." *Id*.

*Licari Family Chiropractic v. Works*, 2021 WL 4506405, at *4-5 (Jan. 11, 2021).

Accordingly, if the Bureau's conclusion is applied to the instant case, then Class A should not be certified because there is no claim. So, the undersigned next turns to the question of whether the Bureau's decision is entitled to deference under the *Chevron* doctrine. "When determining

whether to defer to an agency's interpretation of a statute it implements, the court follows the established *Chevron* framework." *Koch Foods, Inc. v. Sec'y, U.S. Dep't of Labor*, 712 F.3d 476, 480 (11th Cir. 2013). "First, applying the ordinary tools of statutory construction, the court must determine whether Congress has directly spoken to the precise question at issue." *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013) (quoting *Chevron*, 467 U.S. 837, 842-843 (1984)). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id*. But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*.

While not binding on this case, the courts in *Licari* and *Dental Equities* answered the *Chevron* deference question in the affirmative. First, both courts found that Congress had not directly spoken. *Licari*, 2021 WL 4506405, at *6, 7 (citing *Advanced Rehab. & Med., P.C. v. Amedisys Holding, LLC*, 2020 WL 4937790, at *5 (W.D. Ten. Aug. 24, 2020); *Dental Equities*, 2021 WL 6105590, at *8.[6] The *Dental Equities* court provided that "Congress did not define 'any of the . . . terms used in the definition of a telephone facsimile machine, and the ordinary definitions of those terms do not shed light on whether an online fax service is included in that definition." 2021 WL 6105590, at *8 (quoting *Advanced Rehab.*, 2020 WL 4937790 at *5).

As to the second inquiry, *Licari* and *Dental Equities* found that the FCC's determination was based on a permissible construction of the statute. Notably, the *Dental Equities* court stated the following:

> [T]he FCC's determination is "based on a permissible construction of the statute." *See Chevron*, 467 U.S. at 843. In determining that online fax services fall

---

[6] The court in *Dental Equities* also determined that *Amerifactors* applies retroactively. 2021 WL 6105590, at *8.

outside the scope of the TCPA, the FCC sought comments from the community, reviewed an extensive record, and concluded that Congress intended to protect against harms associated with the use of equipment that had the capacity to print. *AmeriFactors*, 2019 FCC LEXIS 3608, 2019 WL 6712128, at *2-4 (citations omitted); *see Palm Beach Golf*, 781 F.3d at 1257 (noting that Congress sought to limit injuries relating to "costs of advertising . . . [on] the recipient" and "occupation of the recipient's facsimile machine" (citations and some alterations omitted)). The Bureau further reasoned that, under the plain terms of the TCPA, an online fax service does not constitute a "telephone facsimile machine." *AmeriFactors*, 2019 FCC LEXIS 3608, 2019 WL 6712128, at *3. And while Congress "made clear that the proscription applies when such a fax is sent <u>from</u>" devices other than a telephone facsimile machine, Congress expressly narrowed the equipment <u>to</u> <u>which</u> it is prohibited to send an unsolicited fax. *Id*. The Court finds this determination based on a permissible construction of the statute.

2021 WL 6105590, at *8; *see also Licari*, 2021 WL 4506405 ("this Court follows [*Advanced Rehab's*] well-reasoned analysis and grants *Chevron* deference to the Bureau's position that online fax services are not covered by the TCPA"); *see Advanced Rehab*, 2020 WL 4937790, at *8 (finding that the *Amerifactors* interpretation was reasonable having first looked at the plain language of the statute and determining that based on the "characteristics of an online fax service," online fax services do not fall within the TCPA's definition of a telephone fax machine).

The undersigned finds *Licari* and *Dental* Equities' analyses are persuasive and recommends that the Court give *Chevron* deference to the Bureau's decision that online fax services are not covered by the TCPA.

Additionally, the undersigned agrees with *Dental Equities*' determination that even if *Chevron* deference does not apply, *Amerifactors* is still persuasive "based on a voluminous record, consistent with earlier and later pronouncements, and decided by the agency with the requisite expertise." 2021 WL 6105590, at*8 (citing *Martin v. Soc. Sec. Admin., Comm'r*, 903 F.3d 1154, 1159 (11th Cir. 2018)).

Based on the foregoing, the undersigned recommends that the Court decline to certify Class A because the online fax service users included within Class A do not have a claim in this TCPA, action.

**B.      Putative Class B**

Having found that Class A should not be certified, the undersigned turns to Plaintiff's request to certify putative Class B, the alternative proposed class of stand-alone fax users.

**1.      Ascertainability**

Apart from standing, ascertainability is another threshold to class certification. *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1302 (11th Cir. 2021). "Class representatives bear the burden of establishing that their proposed class is adequately defined and clearly ascertainable, and they must satisfy this requirement before the district court can consider whether the class satisfies the enumerated prerequisites of Rule 23(a)." *Id.* The Eleventh Circuit has traditionally collapsed class definition and ascertainability into one inquiry. *Id.* According to *Cherry*,

> We hold that administrative feasibility is not a requirement for certification under Rule 23. In doing so, we limit ascertainability to its traditional scope: a proposed class is ascertainable if it is adequately defined such that its membership is capable of determination. Our decision might render redundant the phrase in our precedent that a proposed class must be "adequately defined and clearly ascertainable." But "[d]oublets ... abound in legalese," and this one is required by Rule 23.

986 F.3d at 1304 (internal citations omitted).[7]

To that end, "a proposed class is ascertainable if it is adequately defined such that its membership is capable of determination." *Id.* And "membership can be capable of determination

---

[7] The Eleventh Circuit in *Cherry* stated that "[a] plaintiff proves administrative feasibility by explaining how the district court can locate the remainder of the class *after* certification" and "[t]he plaintiff satisfies this requirement if the district court concludes that the proposed process will be manageable and successful." 986 F.3d at 1303 (internal citations omitted) (emphasis in original).

without being capable of *convenient* determination.  Administrative feasibility is not an inherent aspect of ascertainability." *Id*. at 1303.  (emphasis in original).[8]  *Id.* at 1303.  On the other hand, "[a] class is inadequately defined when it is defined through vague or subjective criteria." *Id*. at 1302 (citing *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970)).  When a proposed class lacks an adequate definition, the district court cannot ascertain who belongs in that proposed class. *Id.* at 1302.

In the instant case, Plaintiff states that it has executed the three-part subpoena process and has identified the proposed class members that received the faxes on a stand-alone fax machine. Doc. 50 at 20.  Plaintiff states that the discussion in *Dental Equities*—which relies on *Cherry*— regarding ascertainability equally applies to putative Class B in the instant case.  *Id*.  Defendants do not spend much time in the Response on ascertainability but do state their opposition to Plaintiff's position.[9]

---

[8]  "Neither this analysis nor the remainder of the Rule 23 analysis requires 'administrative feasibility'; if the action involves a proposed Rule 23 (b)(3) class, the district court may consider administrative feasibility as part of the manageability criterion under Rule 23(b)(3)(D)." *Lyttle v. Trulieve, Inc*., 2021 WL 3602996, at *3 (M.D. Fla. Aug. 13, 2021 (citing *Cherry*, 986 F.3d at 1304).

[9] The parties provide further briefing on the subpoena process and have competing views regarding the ability to identify the purported class members.  The undersigned finds that based on *Cherry*, administrative feasibility is appropriately discussed with respect to Rule 23(b)(3) as it is relevant to manageability.  *See Haines v. Fid. Nat'l Title of Fla.*, 2022 WL 1095961 (M.D. Fla. Feb. 17, 2022) ("Though not a precondition for certification, considerations of administrative feasibility may still be relevant for the Rule 23(b)(3)(D) manageability analysis, but the propriety of a class action should not hinge upon whether the class is ascertainable") (citing *Rensel v. Centra Tech, Inc.*, 2 F.4th 1359, 1361 (11th Cir. 2021); *Cherry*, 986 F.3d at 1303-04).

The undersigned agrees with Plaintiff at least with respect to Class B.[10]  Like the class at issue in *Dental Equities*, the undersigned finds that Class B is adequately defined such that membership is capable of determination.  The language describing the class is described with objective criteria—not subjective or vague terms—and does not take speculation or guesswork to determine.

Accordingly, the undersigned recommends that ascertainability is met for Class B.

### 2.    Rule 23(a)

The undersigned turns to whether Plaintiff has met the requirements of Rule 23(a) with respect to Class B.[11]

### a)    Numerosity

Under Rule 23(a)(1), the party seeking class certification must show that the putative class is so numerous that joinder is impracticable.  To establish numerosity, the party seeking class certification must either demonstrate some evidence in support of the number of purported class members or a reasonable estimate of the same.  *Kuehn v. Cadle Co., Inc.*, 245 F.R.D. 545, 548 (M.D. Fla. 2007) (citation omitted).  In support of Plaintiff's numerosity argument, Plaintiff states that Class A consists of 11,417 unsolicited fax ads sent to 8,990 unique fax numbers.  Doc. 50 at 16 (citing Robert Biggerstaff Rebuttal Expert Report, Doc. 50-2 at 244, ¶¶ 6, 7).  Plaintiff also states in the Motion that Class B consists of 7,877 unsolicited faxes sent to 6,116 unique fax

---

[10] The Court need not reach the issue of ascertainability as it relates to Class A if it agrees that the online fax service users do not have standing or a claim under the TCPA.

[11] Again, since the undersigned finds that Class A is not due to be certified, the remainder of the analysis will mostly focus on Class B—the group Plaintiff narrows to include only stand-alone fax users.  Recognizing that this is a recommendation to the Court, however, the undersigned will address Class A in the report when appropriate.

numbers.  *Id.* (citing Ross M. Good Decl., 50-3 at ¶¶ 13, 14).[12]  Plaintiff's numbers have changed since it received a subpoena response on September 6, 2022 from Comcast.  Ross M. Good's second declaration attached to the Reply states that "to date, the proposed Class B stand-alone fax machine class consists of 6,678 putative class members and 8,529 total faxes."  Doc. 59-1 at 3.

With these figures, Plaintiff contends, without any apparent opposition, that numerosity is satisfied.  *Id.*; *See* Doc. 55.

The undersigned agrees based on the evidence that the numerosity requirement under Rule 23(a)(1) is met.

   b) <u>Commonality</u>

Rule 23(a)(2) requires the party seeking class certification to show that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury . . ..'"  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)).  The Supreme Court has found that, for the purposes of Rule 23(a)(2), a single common question of law or fact is sufficient.  *Id.* at 359.  There is a "low hurdle" to satisfy the commonality element.  *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1356 (11th Cir. 2009).

With respect to the commonality section of the Motion, Plaintiff states simply that "there are six common issues, each of which Plaintiff contends can be resolved classwide."  Doc. 50 at 17.  The undersigned assumes that Plaintiff refers to its statement presented earlier in the Motion under the "Basis for Relief Requested" section, that there are six class-wide questions to decide on the merits to include (1) whether Infucare used a telephone facsimile machine, computer, or other

---

[12] Mr. Ross' first declaration states that "to date, the proposed Class B stand-alone fax machine class consists of 5,520 putative class members and 7,041 total faxes."  Doc. 50-3 at ¶ 13.

device to send the faxes to telephone fax machines; (2) whether the faxes are "advertisements" under § 227(a)(5); (3) whether Infucare is the "sender" of the faxes under § 64.1200(f)(11); (4) whether Infucare had permission to send the faxes; (5) whether online fax service recipients have Article III standing; and (6) whether the TCPA regulates unsolicited fax ads sent to online fax service recipients.  *Id.* at 10.

If the Court adopts the recommendations already made in this Report, then the last two class-wide questions do not apply (related to online fax users).  What remains are the first four class-wide questions articulated by Plaintiff and how each relates to the putative Class B. Plaintiff's question on permission or consent is one of the most significant disputed issues in the briefing.  But the other questions (e.g., how Defendant Infurcare sent the faxes and whether the faxes constitute "advertisements") are easily identified as "common" amongst the class members. *See* Docs. 55, 66.[13]

As only a single common question of law or fact is sufficient to establish commonality, the undersigned recommends that Plaintiff satisfies this requirement for class certification.[14] *See Sliwa v. Bright House Networks, LLC*, 2019 WL 4744938, at *14 (M.D. Fla. 2019) (finding the plaintiff in TCPA wrong number case satisfied low hurdle of commonality element with common question of whether the phone calls were placed with technology prohibited by the

---

[13] Defendants also argue that the proposed class members lack commonality as to whether the faxes were received via standalone fax machine or an online fax service.  Doc. 55 at 17.  As discussed *supra*, the undersigned recommends that the online fax service users do not have standing and the TCPA is not applicable to their claims and, therefore, the undersigned will not reach this argument on the particular issue of commonality under Rule 23(a).

[14] The undersigned notes that "[t]he predominance inquiry is far more demanding than the commonality requirement in Rule 23(a)." *Morgan v. Orlando Health, Inc.,* 2019 WL 7469797, at *7 (M.D. Fla. Oct. 23, 2019) (citing *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1270 (11th Cir. 2009)).

TCPA); *see also Cin-Q Automobiles, Inc. v. Buccaneers Ltd. P'ship*, 2022 WL 911388, at *19 (M.D. Fla. Mar. 29, 2022) (finding in a junk fax case that common questions of fact and law to include whether the faxes constitute advertisements, whether the faxes were sent by or on behalf of the defendant, and whether the faxes complied with the opt-out notice, was enough to establish commonality).

Accordingly, the undersigned recommends that Plaintiff has established commonality under Rule 23(a).

c)   Typicality

Rule 23(a)(3) requires "the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *Williams*, 568 F.3d at 1357 (quoting *Kornberg v. Cornival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984)). Stated another way, typicality requires that there be "a sufficient nexus. . . between the legal claims of the named class representatives and those of individual class members to warrant class certification." *Ault v. Walt Disney World Co.*, 692 F.3d 1212, 1216 (11th Cir. 2012) (quoting *Prado—Steiman*, 221 F.3d 1266, 1278-79 (11th Cir. 2000)). "A sufficient nexus is established if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *Kornberg*, 741 F.2d at 1337. "A class representative must possess the same interest and suffer the same injury as the class members in order to be typical under Rule 23(a)(3)." *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001) (internal quotation omitted).

Here, Plaintiff asserts that typicality is met because Plaintiff and the putative class members were all subjected to the same conduct. Doc. 50 at 17. Defendants argue that Plaintiff's claims are unique or atypical in that Defendants' defenses as to the proposed class members will include

issues of consent and existing relationships, which do not apply to Plaintiff.  Doc. 55 at 18.  In other words, since Plaintiff does not contend that it had a relationship with Defendants or that Plaintiff gave express permission for the faxes—assuming the faxes constitute "advertisements"— there will be issues as to the "variability in the proof of consent" for class members but not Plaintiff.  *Id*. at 18-19.  Defendants also claim that Plaintiff is atypical from many of the other putative class members because Plaintiff does not accept medical insurance.  *Id*. at 19.

Since the undersigned recommends that Class A is not due to be certified because it includes putative members with no standing and that do not have a claim under the TCPA, the Court need not reach the typicality question for this group.[15]  Looking to Class B, the undersigned finds that Plaintiff has not met its burden of establishing that the requirement is met.

First, in the Motion, Plaintiff's entire analysis on typicality for Rule 23(a)(3) purposes is as follows:

> Typicality is satisfied here as to Plaintiff and both Classes because each were subjected to the same conduct, being sent an unsolicited fax ad by Infucare, and all claims are based on the same legal theory, violation of the TCPA.

---

[15] If the Court disagrees with that determination as to Class A, the undersigned still questions whether typicality under Rule 23(a) is met because of the variation in the type of injury. Specifically, Plaintiff received the faxes through a stand-alone machine and not an online-fax service.  Plaintiff, in fact, does not use an online-fax service.  Doc. 55-4 at 61.  As Plaintiff's corporate representative testified, medical practices that received the fax from an online fax via an online fax service would not have the same issues of toner and paper that his practice has by using a stand-alone machine.  Doc. 55-4 at 68.  Assuming the Court finds that receipt of a fax through an online service amounts to "concrete injury" under Article III, the distinction between Plaintiff's harm and the online users harm—which was described as more generalized—still exists.  In other words, the analysis in *Dental Equities* and *Daisy* and the Bureau's statement differentiating online fax use is still relevant and shows why Plaintiff's claim as a stand-alone fax user might not be typical.  Further, even if the injuries are the same, the event that gave rise to the alleged injury would be quite different between Plaintiff—a stand-alone fax user—and the purported members that only used an online service and, therefore, there would be no "sufficient nexus" between Plaintiff's claim and those of the users.

Doc. 50 at 17, citing *A Aventura Chiropractic Ctr. v. Med Waste Mgmt. LLC*, 2013 WL 3463489 (S.D. Fla. July 3, 2013).  Plaintiff's Reply and "Rejoinder" do not specifically add to the analysis.  *See* Docs. 59, 76.  It is Plaintiff's burden to demonstrate that class certification is proper under Rule 23(a) and Plaintiff's conclusory statement with minimal citation to authority—a citation to one TCPA case— does not persuade the undersigned that Plaintiff is entitled to relief.  *See Doe v. Mount Sinai Med. Ctr. of Fla.*, 2007 WL 9701751, at *5 (S.D. Fla. Dec. 4, 2007) ("[P]roof of typicality requires more than general conclusory allegations) (citing *Walco Invests. Inc. v. Thenen*, 168 F.R.D. 315, 326 (S.D. Fla. 1996)); *see also*, *Elliot v. Carnival Cruise Lines*, 2003 WL 25677700, at *3 (S.D. Fla. Oct. 17, 2003) (finding that a conclusory statement regarding the predominance of common questions of law or fact are not sufficient to meet the plaintiff's burden.).

Second, assuming Plaintiff offered more than a bare bones analysis related to Rule 23(a)(3), the undersigned recommends that the typicality requirement is still not met because of the "express invitation" issue of the TCPA claim or defense.  Particularly, Plaintiff did not have a relationship with Defendants and did not consent to the faxes.  Doc. 55-4 at 55, 181, 206-261.  On the other hand, as more fully explained later in this Report with respect to the predominance requirement under Rule 23(b), there is a substantial question with respect to whether other members—stand-alone and online fax service users—gave express permission to send the alleged advertisements and had relationships with Defendant InfuCare, a relationship that is not a defense that applies to Plaintiff.  *See infra* Section 1(E)(1).[16]  While typicality does not require that the class representatives' claims be identical to the other class members, if factual differences between the

---

[16] As discussed with respect to Rule 23(b)'s predominance requirement, Plaintiff's attempt to exclude the members already identified as giving consent does not foreclose the issue because an individualized determination as to the other members' express permission and relationship remains.

representative and the class predominate, the typicality requirement is defeated.  *Grillasca v. Hess Corp.*, 2007 WL 2121726 (M.D. Fla. July 24, 2007) ("[I]f factual differences between the representative's class and class claims predominate, the typicality requirement may be defeated") (citing *Love v. Turlingon*, 733 F.2d 1562, 1564 (11th Cir. 1984)).  "In other words, if courts must make highly fact-specific or individualized determination in order to establish a defendant's liability to class members, there is no typicality."  *Love*, 733 F.2d at 1564.

Here, the undersigned agrees with Defendants that the highly "individualized variability" with respect to this inquiry is not typical to Plaintiff's claim or Defendants' defense to Plaintiff's claim.[17]  The fact-specific determination on express invitation or permission and established relationships will predominate Defendants' liability to the class members when Plaintiff does not face the same significant hurdle.  Typicality is not present if "the factual position of the representative markedly differs from that of other members of the class."  *Kornberg*, 741 F.2d at 1337.

Due to Plaintiff's insufficient conclusory analysis and the substantial variation between Plaintiff and other class members who may have given express permission, the undersigned recommends that Plaintiff has not satisfied its burden.

        d)     <u>Adequacy</u>

---

[17] For example, there is evidence that Defendant Infucare sent the March faxes after a medical practice, with an established relationship, advised Defendant Infucare that the information in the faxes would be useful to medical practices.  Doc. 55-7; *see also*, *infra* Section 1(E)(1).  The representative states that the Center for Complex Neurology, EDS & POTS "has a long-standing, established treatment-based relationship with InfuCare" and "has given its prior express invitation and permission for InfuCare to send communications about InfuCare's programs to the Practice, including by soliciting faxes from InfuCare relating to its services and therapies."  *Id.* at 2.  Plaintiff, to the contrary, does not accept insurance and did not welcome the fax or find it useful.  Doc. 55-4 at 47-48, 55, 181, 260-261.

The fourth and final requirement Plaintiff must satisfy under Rule 23(a) is that "the representative part[y] will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  This requirement involves two inquiries: first, whether there are substantial conflicts of interest between the representative and the potential class members, and second, whether the representative will adequately prosecute the class action.  *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1329, 1323 (11th Cir. 2008).  A fundamental conflict going to the specific issues in controversy warrants denying class certification.  *Valley Drug Pharm. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003).  Also, Rule 23(g)(1)(A) states that the Court must consider the following in determining the appointment of class counsel:

> (i) the work counsel has done in identifying or investigating potential claims in the action;
>
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
>
> (iii) counsel's knowledge of the applicable law; and
>
> (iv) the resources that counsel will commit to representing the class.

*Id*.  A court may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

As an initial matter, it does not appear that Defendants oppose Plaintiff's contention that Plaintiff's counsel would adequately represent the class pursuant to Rule 23(g).  *See* Doc. 55. Indeed, it seems that Plaintiff's counsel has expended substantial effort in litigating this case, and Plaintiff represents that counsel is an experienced class action and TCPA practitioner and has knowledge of TCPA law.  Doc. 50 at 18-19.  There is nothing before the Court to show otherwise, and a review of CM/ECF and PACER confirms that counsel has experience in TCPA litigation. Even if Defendants oppose adequacy on this factor, the undersigned recommends that counsel is adequate under Rule 23(g).

With respect to Plaintiff's role as class representative, Plaintiff asserts that it will continue to adequately prosecute the case, understands the responsibility of representation, and has been substantially involved in the litigation of this case including discovery.  Doc. 50 at 17-18. Defendants argue, however, that adequacy is not established because Plaintiff does not accept insurance and, thus, "does not want the faxes at issue," but "[o]ther putative class members consented to, invited, welcomed, and relied on the faxes." Doc. 55 at 21.[18] Because of the question of permission and relationships, Defendants argue that a conflict defeats Plaintiff's ability to represent the class.[19]

On this issue, the existence of minor conflicts will not defeat class certification; the conflict must be fundamental.  *Valley Drug*, 350 F.3d at 1189.  "A fundamental conflict exists where some party members claim to have been harmed by the same conduct that benefitted other members of the class." *Nguyen v. Raymond James & Assocs.*, 2022 WL 4553068, at *11 (M.D. Fla. Aug. 12, 2022) (quoting *Valley Drug*, 350 F.3d at 1189).

Here, the undersigned finds it problematic that Plaintiff does not directly and sufficiently address the conflict of interest that Plaintiff may have with the putative class members that welcomed the March faxes and gave their express permission to receive them.  Instead, Plaintiff summarily states in the Motion that its claims are identical and "it has no conflicts."  Doc. 50 at

_____

[18] The undersigned notes that Defendants also argue that "Plaintiff's status as a serial litigant" shows conflict as "Plaintiff entered into settlement agreements, but only [sic] behalf of itself individually, and not on behalf of the class members it sought to represent."  Doc. 55 at 21. Defendants point to no citation of authority to support this argument and the undersigned is unaware of any case that would stand for the proposition that an individual cannot act as an adequate representative based purely on the number of lawsuits filed and history of settlement.

[19] To the extent Plaintiff tries to address any conflict by excluding members already identified as giving permission for the faxes, that issue must be addressed on an individualized basis.

11, 17.   Despite filing a Reply and "Rejoinder," Plaintiff fails to adequately[20] respond to Defendants' argument regarding this conflict, which Defendants assert renders Plaintiff an inadequate representative.  *See* Docs. 59, 76.

In other areas of the class certification analysis, Plaintiff addresses this issue of express permission by certain of the proposed class members, but despite the many filing opportunities Plaintiff had concerning the Motion, Plaintiff never sufficiently discusses this issue of conflict— fundamental or otherwise—in this context.  So, Plaintiff fails to provide an explanation why the conflict Defendants identify does not defeat adequacy of representation under the circumstances of this case.  And it is Plaintiff's burden to establish adequacy of representation.  Thus, like the court in *Nguyen*, the undersigned finds that Plaintiff's failure to adequately address the conflicting interests of members of the class is fatal to Plaintiff's claim that it is an adequate representative. 2022 WL 4553068, at *11.[21]  In short, the undersigned finds that Plaintiff has not met its burden of establishing adequacy of representation.[22]

### 3.    Rule 23(b)

---

[20] Instead, Plaintiff briefly asserts that whether class members "like" receiving the faxes is irrelevant.  Doc. 59 at 8.  The undersigned finds that this statement does not sufficiently address the conflict of interest issue.

[21] The court in *Nguyen* found that the plaintiff did not carry her burden because she did not address the potential fundamental conflict of interest with the members of the class who were not dissatisfied with their account.  *Id*.

[22] Alternatively, even assuming that Plaintiff's filings are cumulatively construed to adequately address conflict of interest pursuant to Rule 23(a)(4), the undersigned still recommends that Plaintiff has not established that it would be an adequate representative for Class A or Class B. With respect to Class A, Plaintiff is attempting to represent purported class members that face a substantial barrier to their claims (i.e., those with an online fax service), while Plaintiff does not have the same barrier since it is a stand-alone fax machine user.  As to both Class A and Class B, Plaintiff also appears to be in fundamental conflict with members that may encounter an express permission and established relationship defense that Plaintiff will not need to defend against. Accordingly, the undersigned still recommends that Plaintiff has not established adequacy of representation.

Rule 23(b)(3) requires that the "questions of law or fact common to class members predominate over any questions affecting only individual members." When determining predominance the Court must carefully scrutinize the relationship between common and individual questions in the case. *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016). An individual question requires evidence that is different from one class member to another, but a common question can be resolved by the same evidence for each class member, or the issue can be proven by generalized, class-wide proof. *Id.* In reviewing predominance, the court determines whether the common issues are more prevalent or important than the individual issues. *Id.*

The other Rule 23(b)(3) requirement is that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The superiority inquiry requires the court to determine whether a class action is an efficient and manageable method of dispensing with the issues to be litigated. *Mills v. Foremost Ins. Co.*, 269 F.R.D. 663, 678 (M.D. Fla. Sept. 29, 2010).

a)   <u>Predominance</u>

The predominance inquiry is far more demanding than the commonality requirement in Rule 23(a). *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1270 (11th Cir. 2009). "To determine whether the requirement of predominance is satisfied, a district court must first identify the parties' claims and defenses and their elements." *Brown*, 817 F.3d at 1235 (citing *Klay v. Humana, Inc.*, 382 F.3d 1241, 1254 (11th Cir. 2004). After that, the issues should be classified as either common or individual questions "by predicting how the parties will prove them at trial." *Id.* Where the evidence varies among members, those are individual questions. *Id.* Where the same evidence is sufficient for each member, those are common questions. *Id.* "After identifying the common and individual questions, the district court should determine whether the common questions

predominate over the individual ones." *Id.* at 1234-35.  Predominance should be evaluated by considering its purpose: guaranteeing that the class action is efficient in terms of time, effort, and expense and promotes uniformity of decisions regarding similarly situated people, "'without sacrificing procedural fairness or bringing about other undesirable results.'"  *Id.* at 1235 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997)).

For the reasons previously mentioned, the undersigned finds that individual questions would predominate if the Court certifies the putative Class A.  Assuming the TCPA even applies to online fax service users—which the undersigned finds that it does not—the issue of whether a concrete injury exists, or standing, would need to be determined on an individualized basis.  Namely, the question of whether the class member may proceed under Article III would vary between the proposed class members that utilized stand alone fax machines and the online fax service users and even between each user of the latter group.  As such, individual questions on standing will predominate over the common issues in the case with respect to the putative Class A and, therefore, the undersigned recommends that Plaintiff has not satisfied the predominance requirement pursuant to Rule 23(b).  *See Cordoba*, 942 F.3d at 1277.

The undersigned also reaches the same conclusion with respect to Class B.[23]  While it appears that the evidence would be the same for all putative members to answer the question of

---

[23] Defendants also seem to raise a standing issue as to Class B as it relates to predominance.  While Defendants primarily focus on standing for the online service fax users like the court in *Dental Equities* (*see* Doc. 55 at 12-15), Defendants also mention, without citation to authority, that putative class members that gave consent would not suffer an injury-in-fact under Article III.  Doc. 55 at 23, 24.  Defendants assert that such individualized issues of standing would predominate.  *Id.*  Defendants' position is understandable, but authority supports the proposition that individualized questions on consent do not implicate standing.  *See Glasser v. Hilton Grand Vacations Co., LLC*, 2017 WL 34823, at *2 (M.D. Fla. Jan. 3, 2017) (finding that prior consent is an affirmative defense under the TCPA and whether the plaintiff consented to the calls goes to the merits of the claim and not whether jurisdiction is proper) (citing *Murphy v. DCI Biologicals Orlando, LLC*, 797 F.3d

whether the March faxes were "advertisements" and to determine the device Defendants used to send the alleged "advertisement," the evidence will be different from one class member to the next on the matter of consent resulting in individual issues taking over in this case.

Specifically, it seems the parties agree that a major focus of the dispute as it relates to predominance is the issue of invitation or permission and Defendants' established relationships. Again, the TCPA defines the term "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." 47 U.S.C. § 227(a)(5).

Plaintiff tries to circumvent any predominance concerns by excluding from the proposed classes—both Class A and Class B—"practices/physicians with whom Infucare claims to 'have a relationship,' including those that have signed declarations regarding permission." Doc. 50 at 10. Plaintiff refers to a "handful of declarations" that certain physicians or practices signed, which address permission. Doc. 50-2 at 44-48, 64-75.[24] Also, citing to discovery responses, Plaintiff states that Defendant Infucare claims that its records show that at least 1,694 of the recipients of the March 11 fax and 226 recipients of the March 18 fax had "relationships" with Defendant

---

1302, 1305); *see also*, *Oliver v. TTC-Ameridial, LLC*, 2018 WL 1255017, at *4 (N.D. Ill. Mar. 12, 2018) (finding that the "prudential standing argument effectively merges with the consent defense; it is really a merits argument" and "the Court does not think it appropriate to import an affirmative defense into a threshold determination of standing") (citing *Leyse v. Bank of Am., N.A.*, 804 F.3d 316, 327 (3d Cir. 2015) (declining to resolve a TCPA claim on standing grounds when consent as an affirmative defense may resolve the matter).

[24] Defendants' counsel, Holland & Knight, created the declarations and Defendant Infucare's CEO, Devendra Patel, sent the declarations to the physicians. Doc. 50-2 at 44-46. Defendants describe these physicians or practices as a small sample of class members that were sent the fax under similar circumstances. Doc. 55 at 10.

Infucare "such that said practices 'invited and permitted such communications from Infucare.'" Doc. 50 at 14, citing Doc. 50-3 at 206-207; Doc. 72.[25]  Plaintiff states that "Plaintiff's Rule 23 motion excludes all seven Declarants as well as those practices for which Infucare claims a 'relationship' (which includes the Declarants, *see* Good Decl. at ¶¶ 12-14), making this a 'purchased list' case."[26]

While it appears at first blush that Plaintiff's exclusion resolves any concern regarding the individualized question of permission as it relates to Rule 23(b)—after all, if there is prior express invitation or permission then there is no TCPA violation—a closer look at the evidence reflects there is no theory of generalized proof that would demonstrate that other members of the proposed classes either did or did not consent to the March faxes.[27]  As one court put it, "[w]hether consent to receive a fax that otherwise violates the TCPA poses questions of such an individualized nature

---

[25] In the Response, Defendants state that "[i]n addition to seven sworn declarations from recipients who consented to receive the information at issue and other record evidence establishing *more than* 888 established relationships among the recipients, Infucare has additional consent-based defenses for other putative class members that can only be determined on an individual-by-individual basis."  Doc. 55 at 5 (emphasis in the original).

[26] Plaintiff states that it has excluded the declarants from both proposed classes.  Doc. 50 at 14 n.2. Also, Plaintiff states that Defendant Infucare cross-referenced the March faxes, which it asserts were successfully sent, with Defendant Infucare's CPR+ database that "purportedly reflect the claimed relationship with Infucare as to 1,694 of the recipients of the March 11 Fax and 226 recipients of the March 18 Fax" and excluded these recipients.  *Id.*

[27] There appears to be some question in the authority as to whether it is a plaintiff's burden to prove classwide lack of permission as it relates to predominance or a defendant's burden to demonstrate permission as an affirmative defense.  But, as the *Licari* court explained, "[r]egardless of whether it is Plaintiffs' or Defendant's ultimate burden to prove consent on the merits, the Court's duty at this preliminary stage is to determine whether that question will involve individual inquiries as to the putative class members such that class treatment would be unworkable and inappropriate."  2019 WL 7423551, at *7; *see also*, *New Concept Dental v. Dental Res. Sys.*, 2020 WL 3303064, at *8 (S.D. Fla. Mar. 3, 3020) (finding that "it is irrelevant who has the burden of proof of consent.").

as to defeat the predominance requirement is a fact-specific inquiry hinging on the viability of classwide proof modalities." *New Concept* Dental, 2020 WL 3303064, at *8 (S.D. Fla. Mar. 3, 2020) (citing *Licari*, 2019 WL 7423551, at *6) (collecting cases). "Several appellate courts have concluded that consent issues requiring individual inquiries in this context are predominance-defeating." *Id.* (citing *Brodsky v. HumanaDental Ins. Co.*, 910 F.3d 285, 288 (7th Cir. 2018); *Sandusky Wellness Center, LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460 (6th Cir. 2017); *Gene And Gene LLC v. BioPay LLC*, 541 F.3d 318, 322 (5th Cir. 2008)).

Here, Plaintiff attempts to demonstrate that individual inquiries are unnecessary because the fax numbers have been obtained from a single source—Definitive Health—and the evidence shows that Defendant Infucare made no attempt to seek permission from these recipients. Doc. 50 at 21-22. Briefly, Defendants' CEO, Devendra Patel, explains that he directed Christina Davis, a sales director, to obtain physician data from certain specialties to include fax numbers and she used Definitive Heath, which is a third-party list provider, to obtain the information. The information was then given to Chirag Shah in Defendant Infucare's IT department, who sent the March 10th and 11th fax through Concord—the third-party broadcaster—to the fax numbers. Doc. 50-2 at 28-31.[28] As Plaintiff asserts, Mr. Patel states that neither he nor anyone else at Infucare sought permission to send the faxes at issue, and Defendant Infucare does not have any documents that show that anyone had given permission to receive the faxes. Doc. 50-2 at 51.

Ms. Davis adds that while Defendant Infucare has a main database that stores information on "existing physicians" called CPR+, she used Definitive Health to pull the data in March 2021 and did not cross-reference the Definitive Health data to the CPR+. Doc. 50-2 at 112-13. Ms.

---

[28] Mr. Patel also testified that he believes the list for the March 18th fax also came from Definitive Health. Doc. 50-2 at 37-38.

Davis testified that when she pulled the data, she did not personally call any of the physicians on the lists to seek permission to send the March 10th and March 11th faxes nor did she instruct anyone at Defendant Infucare to do so.[29]  Doc. 50-2 at 130-31.  Mr. Shah also confirms that, other than the declarations, he is not aware that Infucare sought permission from the recipients to send the faxes at issue and he does not recall being instructed to seek permission to send the faxes.  Doc. 50-2 at 37-38.

Plaintiff contends that these admissions show that if Plaintiff excludes the declarants and other members who have already been identified as providing consent, then additional issues on consent do not remain and the predominance requirement is not defeated.[30]  Doc. 50 at 13.  In other words, with the exclusion of the identified claimed relationships to include the seven declarants, this is a straight up "purchased list" case with no other evidence demonstrating permission.

Defendants assert, however, that Plaintiff misreads the evidence.  The undersigned agrees at least to the extent that Plaintiff's view is too narrow.  While these deponents were unaware of any evidence—and there does not seem to be any—of prior express permission *specifically* directed at each of the March faxes, that does not mean that there is no evidence of prior express permission to send faxed advertisements, which would extend to the March faxes.

 If Ms. Davis' deposition is read further, she testified that she was not aware of Defendant Infucare reaching out to physicians for permission to send the faxes in March 2021, *but* she is

---

[29] Ms. Davis was not involved with the March 18th fax.  Doc. 50-2 at 131.

[30] The declarations are from physicians or practices who assert that they have "always given prior express invitation and permission for Infucare to send communications" including "faxes that could be considered advertisements," even if they did not consider the March 11 or 12th faxes to be advertisements.  Doc. 50-3 at 114-125.  While Plaintiff excludes these declarants, it seems the declarations still show that this is not simply a "purchase list" case as Plaintiff contends.

aware of "verbal" and "email" permission that is "not specific only to that one fax."  Doc. 50-2 at

132.

Ms. Davis states the following in her declaration:[31]

I have reviewed the table of contact information in MS Excel format entitled "IC000807.xlsx" and "IC000808.xlsx".  I understand these tables were prepared using information stored in a clinical software that InfuCare utilizes, called CPR+, to demonstrate some of the established relationships InfuCare has with practices and providers to whom the faxes at issue were directed.

While information contained in CPR+ would show some of the practices and providers who provided their prior express permission for InfuCare to send faxes to them, it is not exhaustive.  Instead, this would only show some of the established clinical relationships that Infucare has.

InfuCare and its sales representatives have obtained prior express permission to send faxes to practices and providers beyond the information reflected in CPR+.  InfuCare has obtained this permission in various ways.   InfuCare and its representatives have been asked to send faxes about its infusion therapy services to physician practices and officers during virtual Zoom and Microsoft Teams videoconferences and calls, telephone calls, and in-person meetings, including at physicians' offices.

In meetings and on calls and videoconferences, InfuCare and its representatives are commonly asked by physician's and offices to send faxes with additional information about InfuCare therapies and services.  As a result, InfuCare and its representatives have knowledge of relationships and prior express permission that are not reflected in its CPR+ files.  Evidence of these relationships and permission would be reflected in written documentation only as part of the files of its individual representatives that are maintained in different locations and in different ways.  InfuCare would need to do a relationship-by-relationship investigation and analysis of each physician's office to determine whether it had prior express permission to send the faxes at issue in this case beyond what is evidenced by the CPR+ records.

---

[31] Plaintiff argues, in part, in the Reply that Ms. Davis' declaration should be disregarded as untimely.  Doc. 59 at 6.  Plaintiff states that Defendants are seeking to "manufacture evidence" after the close of discovery and after Plaintiff's Rule 23 motion.  *Id*.  The undersigned is unaware of—and Plaintiff does not cite—any rule of procedure that would prohibit the use of a declaration in support of a response to a motion to certify class even if created after the close of discovery as the undersigned does not deem it "discovery."

Doc. 55-9.[32]

Based on the foregoing, it seems that Plaintiff's solution to exclude the seven declarants and other identified, claimed relationships from the CPR+ to make this a "purchase list case" would not sufficiently resolve the issue of permission, and further investigation on a case-by-case basis would be necessary.  "[T]he need for testimony by defendant-representatives that consent was received through 'individual communications and personal relationships' has been sufficient to create an individualized issue on consent in numerous cases that defeats the predominance question."  *Licari*, 2019 WL 7423551, at *9 (citing *True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 932 (9th Cir. 2018) (one declaration and one deposition by defendant representatives supported denial of class certification of one of the plaintiffs' proposed classes); *Gene And Gene, LLC v. BioPay* LLC, 541 F.3d at 329 (relying on the defendant's employees' testimony in upholding denial of class certification); *Sawyer v. KRS Biotechnology, Inc.*, 2018 WL 2425780, at *12 (S.D. Ohio May 30, 2018), *report and recommendation adopted*, 2018 WL 4214386 (S.D. Ohio Sept. 2018) (finding that the defendant produced predominance-defeating evidence where the defendant offered testimony, as well as an affidavit that its technology officer contacted 5 numbers from a fax log and that each consented to receive transmissions and finding no reason to distinguish between documentary evidence and testimonial evidence at the class certification stage.).

That said, the undersigned recognizes that Plaintiff makes a well-taken point in the "Rejoinder" on this issue—albeit without citation to authority.  Specifically, Plaintiff challenges Defendants' alleged lack of evidence demonstrating prior permission outside of the already

---

[32] Defendants state that IC000807.xlsx and IC000808.xlsx are Excel tables prepared using information stored in CPR+ to demonstrate some established relationships Defendant Infucare has with practices to whom the March faxes were directed.  Doc. 55 at 10-11.

excluded members.  Doc. 76 at 2.  Indeed, the *Licari* court found that "the [d]efendant may not place consent at issue as a predominance-defeating question without presenting any evidence." 2019 WL 7423551, at *7.  "However, once the defendant has 'presented sufficient, non-speculative evidence that a bona fide issue of consent exists as to all other faxes, [the plaintiff] [i]s required to come up with something (whether argument or evidence) to persuade the[e] Court that those individualized consent issues would not drive this litigation, making a class action untenable." *Id*. (quoting *Sawyer*, 2018 WL 2425780, at *9).

The undersigned finds that this is not a case where Defendants offer rank speculation on the issue of prior express permission and established relationships.  In addition to Ms. Davis' deposition and declaration—which are indeed evidence—Defendants submit a declaration from a representative at a medical practice, which Defendants describe as having a "longstanding relationship with InfuCare."  Doc. 55.  Fran Saperstein, Administrator & COO of the Center for Complex Neurology, EDS & POTS (the Practice), declares the following:

> 7.      The Practice receives information related to the specific healthcare purpose for which InfuCare provides patients with Immunoglobulin Therapy, including, among other things, detailed nursing notes and other information regarding each patient and the patient's response to the treatment.

> 8.      The Practice has given its prior express invitation and permission for InfuCare to send communications about InfuCare's programs to the Practice, including by soliciting faxes from InfuCare relating to its services and therapies.

> 9.      In fact, on March 1, 2021, I called and emailed Chris Davis of InfuCare after the Practice received a facsimile from another provider, Coram CVS Specialty Infusion Services, relating to its infusion services and its inclusion as a preferred provider for Cigna.

> 10.      Because I was aware that InfuCare had also recently become a preferred provider for Cigna, I suggested that Ms. Davis inform other medical providers and practices about InfuCare's new status as a preferred provider for Cigna.  Having such information allows providers and practices to have more options and better selections for the care of patients.

11.     The Practice received InfuCare's fax about its status as a preferred provider of Cigna on March 10 or 11, 2021.

12.     The fax provides certain information regarding InfuCare's Immunoglobulin Therapy selection as a preferred provider for specific healthcare services and information regarding InfuCare's Immunoglobulin Therapy, including healthcare-specific updates. . .

13.     The Practice considers the fax to be an informational update about these treatment options and welcomes such communications, which are critical to educate the Practice on medical treatment specifics so that the Practice continues to provide informed physician treatment and patient choice as to healthcare needs and treatment program options.

14.     The Practice does not consider the fax to promote the sale of any good or services.  Rather, it provided information about specialized treatment program that is available and can be a treatment option for specific patients based upon their conditions, including certain administrative information that patients ask when inquiring as to a recommended treatment.

15.     The Practice desires to stay informed about InfuCare's programs for the benefit of the Practice itself and its patients, and InfuCare has obtained the Practice's consent for faxes and other communications.

16.     During the course of the Practice's prior communications with InfuCare, the Practice provided its fax number and specifically invited facsimiles from InfuCare regarding the availability and quality of InfuCare's programs.

        ***

Doc. 55-7.

        Ms. Davis testified that she spoke with Ms. Saperstein and the email was a follow-up to a

conversation wherein Ms. Saperstein expressed that her practice "really appreciated getting faxes

of notifications of announcements of inclusions on insurance company. . . changes so they could

better select pharmacies."  Doc. 50-2 at 102-103.  Ms. Davis testified that while she did not instruct

anyone to call any of the physicians to obtain permission to send the March 2021 fax, "[Defendant

Infucare] had several doctors request changes, like Saperstein, that we notify them" . . . permission

was given "[e]ither verbal or email, like Fran, but it's not specific only to that one fax.  It's to send all of these."  *Id*. at 131, 132.

That is not to say that Fran Saperstein and her medical practices' business relationship is not reflected in Defendant Infucare's CPR+, but her representations regarding prior communications on consent demonstrate that such communications have occurred and highlight the need for an individualized inquiry regarding that element of the TCPA claim.  As such, even though there may not be documents reflecting that physicians gave express consent that would *specifically* identify the March faxes, it seems that there is some evidence that permission to send faxes—which might be "advertisements" under the TCPA—in general exists, which will not be common to all class members.[33]

Further, Defendants cite to Mr. Shah's deposition which provides additional support for the contention that individual inquires on established relationships would need to occur as to both putative classes.  Mr. Shah explained that even though the CPR+ is the only system that can be used to confirm a business relationship, "[e]verything else [Defendant Infucare would] have to go line by line for each number and reach out to the sales team member to identify if they have a direct course.  Whether they have a relationship."  Doc. 55-5 at 6.

Based on the foregoing evidence, the undersigned concludes that even with Plaintiff's proposed exclusion, the issues of invitation or permission and whether established relationships

---

[33] Ms. Davis and Mr. Patel maintain in their depositions that the faxes do not constitute "advertisements."  *See* Docs. 50-2 at 130; 55-6 at 7.  As such, it is not surprising then that Ms. Saperstein speaks of consent to send communications about InfuCare's programs to the Practice without using the word "advertisement" and disputes that the March 10 and 11th faxes.  Even so, the issue of express permission should not turn on whether Ms. Saperstein or Defendants deem the March 2021 to be "advertisements" under the TCPA.  That question will be addressed later in the case.  At this stage, the Court is examining whether the question of prior permission is one susceptible to class-wide resolution and the evidence here shows that it is not.

exist is predominance-defeating.  For the sake of clarity, the undersigned acknowledges that it does not seem that generalized consent to *faxes* would be enough.  But there is a question of a highly individualized nature as to whether practitioners with a relationship with Defendants gave "express invitation or permission" to receive faxed advertisements.  Even though Plaintiff tries to limit the members to those Definitive Health provided, that does not mean Defendants are incorrect that individual inquiries remain, which cannot be answered with generalized proof and will predominate.  *See Hicks v. Client Servs.*, 2008 WL 5479111, at *8 (S.D. Fla. Dec. 11, 2008) (finding that class certification would be improper because consent is an issue that would have to be determined on an individual basis at trial); *see also*, *Blake Tishman, P.A. v. Baptist Health S. Fla. Inc.*, 2019 WL 3890506, at *20 (S.D. Fla. June 10, 2019) (finding persuasive declarations from medical practices including one that stated that the "medical '[p]ractice always has given its prior express invitation or permission to Baptist Health and its affiliated entities to transmit advertisements from them to the Practice concerning the Programs, including by means of facsimile messages.")).

Accordingly, the undersigned recommends that class certification is not appropriate under Rule 23(b).  *See Licari*, 2021 WL 7423551, at *11 (finding that individualized issues concerning whether putative class members of each of the proposed classes provided prior express permission precludes class certification in that matter.).

b)    <u>Superiority</u>

The last requirement for class certification under Rule 23(b)(3) is that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  "[T]he superiority requirement of Rule 23(b)(3) turns on whether a class action

is better than other available methods of adjudication . . . ." *Cherry*, 986 F.3d at 1304.  The Court looks to the non-exclusive factors listed in Rule 23(b)(3):

> (A)  the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B)  the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C)  the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D)  the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D).

Having already found that Plaintiff has defined the classes for ascertainability purposes, the undersigned turns to the next issue addressed by the parties in this context: the subpoena process as it relates to Rule 23(b)(3).  Plaintiff states that it has executed the three-part subpoena process and has identified the proposed class members that received the March 2021 faxes on a stand-alone fax machine.  Doc. 50 at 20.  Defendants contend that, as it relates to Class B, the Court will have to answer the question of whether the faxes were received via a stand-alone machine or an online service "to figure out whether each member meets the class definition in the first place."  Doc. 55 at 26.  Defendants state that "[o]f the carriers that responded to the subpoenas, carriers comprising approximately 89% of the numbers indicated they do not know whether the users had a stand-alone fax, online-fax service, or something else."  *Id*. (citing Doc. 55-2, K. Sponsler's Supp. Expert Report).   As such, Defendants argue in the Response that the individualized inquiry into class membership would make maintenance of the class unmanageable. *Id*. at 27.  In support of the argument, Defendants also attach declarations from phone carriers

which provide that they do not have a mechanism to determine whether subscribers received faxes on a standalone fax machine or via online fax service.  Doc. 55-3.[34]

Defendants claim that "Plaintiff's failed subpoena process confirmed that it does not have any way to distinguish between stand alone fax users and on-line fax users ithout an exhaustive, individualized inquiry.  Thus, Class B is not ascertainable."  *Id.*

In the Reply, Plaintiff argues that Defendants' position on the subpoena process is based on speculation because the results show that there are 5,520 members in Class B that received 7,041 faxes based on the count of numbers for the whom the carrier did not provide online fax services."  Doc. 59 at 2.  Plaintiff challenges reliance on Defendants' declarations because "it is undisputed that the phone carrier subpoena respondents know which recipients subscribed to an online fax service offered by the carrier (and thus would be excluded from Class B)."  *Id.*  Instead,

---

[34] The carriers provide the declarations in response to subpoenas and declare as follows:

- Lumen Technologies: "Lumen does not have a mechanism to determine whether its subscribers received faxes on a standalone fax machine or via online fax service. Lumen does not know whether a subscriber used a third-party online fax service."
- AT&T: "AT&T does not have a mechanism to determine if any of the subscribers whose telephone numbers are among the 1,896 numbers in the .csv list procured online fax service from a third party and/or was using a stand-alone fax machine or any other technology to receive faxes.  Further, A&T can only identify if a telephone number was assigned to an AT&T account.  AT&T cannot confirm whether a subscriber received or sent a fax or used a fax machine or online fax service to receive or send faxes electronically.
- Frontier: "Frontier is unable to identify how a subscriber is using its voice service, including whether a subscriber procured online fax service from a third-party or was using a stand-alone fax machine or any other technology to receive faxes."
- Verizon: ". . . Verizon does not have information available to allow it to determine whether any Verizon customer associated with the telephone numbers used the number with a traditional fax or online service because Verizon cannot determine whether a subscriber used another provider's online fax service product."

Doc. 55-3.

Plaintiff points out that Defendants' expert admits that the phone carriers for 7,280 numbers stated the subscribers did not have an online fax subscription, while 20 numbers were for online fax service subscriptions.  *Id.* at 3.

It seems the discrepancy between the parties' positions stems from two scenarios Defendants' expert posits: (1) where the subscriber to the telephone number is "call-forwarding" to an online fax service, and (2) where the user receives online fax service from an intermediary provider.  Docs. 55-1 at 28 (K. Sponsler's Expert Report at ¶ 60); 55-2 (K. Sponsler's Supp. Expert Report at ¶ 12).[35]

Plaintiff argues that there is no evidentiary support for this "call-forwarding" theory because Defendants' expert "admits he is unaware in any of the reports he has generated regarding the subpoena process of a single instance of call-forwarding of a fax line to an online fax service" and the expert could only identify two "re-sellers" who could provide online fax services to a recipient.  Doc. 59 at 3-4.[36]  Plaintiff contends in the "Rejoinder" that even though five of the declarants claimed their practices received faxes via an "online fax service" when the carrier does not provide such a service, this is not evidence in support of Defendants' position because the recipients—as they are online fax service users—have been excluded from the proposed class. Doc. 76 at 2.

Based on the foregoing, the undersigned finds that Defendants' argument regarding the ability to locate or identify the online fax service users is based on more than speculation.  It seems

---

[35] Defendants' expert explained call forwarding of a number to an online fax number during his deposition.  Doc. 50-3 at 50.

[36] Defendants contend that Plaintiff's characterization of its expert's testimony is misleading because the expert testified that "we did have at least one or two subpoena responses where the carrier said that the number was forwarded."  Doc. 66 at 3 n.2.

that the information from the phone carriers, Defendants' expert, and the declarants—even if

excluded as class members—calls into question the Court's ability to efficiently manage the case

as a class action.  But *again*, the undersigned emphasizes that "the *Cherry* court specified that

administrative feasibility was primarily relevant to the superiority requirement of Rule 23(b)(3),

and that lack of administrative feasibility was not an absolute prohibition on a finding of

superiority but merely one factor the court should balance in deciding whether a class action

creates more or less management problems than any other alternative."  *Scoma Chiropractic, P.A.,*

*et. al. v. Dental Equites, LLC, et. al.*, 2021 WL 1566668, at *3 (M.D. Fla. Apr. 21, 2021) (citing

*Cherry*, at 1304).  The Eleventh Circuit in *Cherry* provided that:

> Nor does a requirement of administrative feasibility follow from Rule 23(b). To be
> sure, administrative feasibility has relevance for Rule 23(b)(3) classes, in the light
> of the manageability criterion of Rule 23(b)(3)(D). *See* Rubenstein, 2 *Newberg on*
> *Class Actions* § 4:76, at 301 (5th ed. 2012).  Rule 23(b)(3)(D) instructs the district
> court, in deciding whether "a class action [would be] superior to other available
> methods for fairly and efficiently adjudicating the controversy," to consider "the
> likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). A difficulty
> in identifying class members is a difficulty in managing a class action. *See Briseno*,
> 844 F.3d at 1126. But because Rule 23(b)(3) requires a balancing test, it does not
> permit district courts to make administrative feasibility a requirement. The
> manageability inquiry focuses on whether a class action "will create relatively more
> management problems than any of the alternatives," not whether it will create
> manageability problems in an absolute sense. *Klay v. Humana, Inc.*, 382 F.3d 1241,
> 1273 (11th Cir. 2004), *abrogated in part on other grounds by Bridge v. Phoenix*
> *Bond & Indem. Co.*, 553 U.S. 639, 128 S. Ct. 2131, 170 L. Ed. 2d 1012 (2008). And
> the district court must balance its manageability finding against other
> considerations. Fed. R. Civ. P. 23(b)(3). So administrative difficulties—whether in
> class-member identification or otherwise—do not alone doom a motion for
> certification. Indeed, we have made clear that manageability problems will "rarely,
> if ever, be in [themselves] sufficient to prevent certification." *Klay*, 382 F.3d at
> 1272.

*Cherry*, 986 F.3d at 1303.

Thus, to be clear, the undersigned finds that the difficulty in identifying the online fax

service users through the subpoena process is a factor in the balancing test that weighs against

certification even though not dispositive or otherwise a requirement under Rule 23(b)(3).  In fact, putting identification aside, the undersigned still finds that Plaintiff has not established superiority. The predominate issue of express permission and established relationships described in this report persuades the undersigned that a class action would not be the superior method to litigate this matter.  "[T]he predominance analysis has a tremendous impact on the superiority analysis . . . for the simple reason that, the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims . . . ." *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1184 (11th Cir. 2010).  Accordingly, the undersigned recommends that Plaintiff has not established superiority under Rule 23(b).

## IV.    Conclusion

Based on the foregoing, the undersigned respectfully recommends that Plaintiff's Motion for Class Certification (Doc. 50) be **DENIED**.

## <u>NOTICE TO PARTIES</u>

The party has fourteen days from the date the party is served a copy of this report to file written objections to this report's proposed findings and recommendations or to seek an extension of the fourteen-day deadline to file written objections.  28 U.S.C. § 636(b)(1)(C).  A party's failure to serve and file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  *See* 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1).

Recommended in Orlando, Florida on November 16, 2022.

DANIEL C. IRICK
UNITED STATES MAGISTRATE JUDGE